Lucas A. Messenger, Bar No. 217645
LMessenger@RobinsKaplan.com
**ROBINS KAPLAN LLP**
2049 Century Park East, Suite 3400
Los Angeles, CA  90067-3208
Telephone: (310) 552-0130
Facsimile:  (310) 229-5800

Lauren J. Coppola (*pro hac vice* to be filed)
LCoppola@RobinsKaplan.com
Timothy D. Wenger (*pro hac vice* to be filed)
TWenger@RobinsKaplan.com
**ROBINS KAPLAN LLP**
800 Boylston Street, Suite 2500
Boston, MA  02199
Telephone: (617) 267-2300
Facsimile:  (617) 267-8288

Attorneys for Plaintiff
HD Carrier, LLC

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| HD CARRIER, LLC,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>AT&T CORP.,<br><br>　　　　　　Defendant. | Case No. 2:20-cv-06509<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

**<u>INTRODUCTION</u>**

1.　　　Defendant AT&T Corp. ("AT&T") is intentionally choking and blocking telephone calls transmitted to plaintiff HD Carrier, LLC ("HD Carrier") and the applications and services that rely on HD Carrier's telephone numbers. This conduct has caused tens of millions of telephone calls to fail.  Most of these calls are to well-known conference call and robocall blocking services.  By severely limiting the capacity of its connections to HD Carrier's network, AT&T is dropping calls, causing callers to hear busy signals, and forcing hang ups by degrading call

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1  quality.  This has created an untenable business situation for HD Carrier and left it

2  unable to serve existing customers, let alone take on additional ones.  AT&T's

3  conduct is particularly troublesome because it comes at a time when the country has

4  moved to working at home *en masse* due to the COVID-19 pandemic.

5      2.  AT&T's call-blocking singles out HD Carrier in a transparent effort to

6  put it out of business.  AT&T connects calls without issue to other similarly

7  situated carriers, including HD Carrier's competitors, even when those calls are

8  destined to the exact same conference call services and other applications serviced

9  by HD Carrier.  The services that rely upon HD Carrier's telephone numbers report

10  that when they port or move their telephone numbers from HD Carrier' network to

11  another carrier, AT&T calls to those numbers are connected without problems.

12      3.  AT&T's conduct is a clear and knowing violation of Federal

13  Communications Commission (the "Commission") rules and regulations.  Blocking

14  calls to harm smaller carriers is a tactic that has been part AT&T's playbook since

15  at least 2001, resulting in a number of Commission decisions and orders adverse to

16  AT&T.

17      4.  AT&T's call-blocking must be stopped, and failure to do so would

18  result in irreparable harm to HD Carrier and the telephone call-consuming public.

19  AT&T has been undeterred by customer complaints, business outreach, and

20  notifications to the Commission.  It refuses to take proper measures to ensure call

21  completion, leaving HD Carrier with little choice but to turn away business.

22  Accordingly, HD Carrier seeks the entry of a preliminary and permanent injunction

23  enjoining AT&T from blocking, chocking, reducing, restricting, or capping calls

24  destined to HD Carrier.  HD Carrier also seeks monetary and declaratory relief to

25  remedy the harm that AT&T has inflicted on HD Carrier and will continue to inflict

26  if not stopped.

27

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

**PARTIES**

5.     Plaintiff HD Carrier is a Nevada limited liability company with a principal place of business in Henderson, Nevada.  HD Carrier also has corporate offices in Long Beach, California, and network operations staff in Long Beach, California.

6.     Defendant AT&T is a New York corporation with a principal place of business in Bedminster, New Jersey.  AT&T employs various networks and affiliates to provide telephone, television, and internet access services throughout the United States.  As a provider of interstate long distance service, AT&T is a "common carrier" under the Communications Act, 47 U.S.C. § 151 *et seq.* (the "Act").

**JURISDICTION AND VENUE**

7.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 47 U.S.C. § 207, and 28 U.S.C. § 2201(a).  This case arises under federal statute, specifically 47 U.S.C. § 201(b), 47 U.S.C. § 202(a), 28 U.S.C. § 2201(a), and 28 U.S.C. § 2202.

8.     The Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because it is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9.     The Court has personal jurisdiction over AT&T because AT&T has substantial business activities in California, is registered to do business in California, and has many retail stores, network equipment, and other business operations in California.  AT&T is also an incumbent local exchange carrier in California, licensed by the California public utility commission.  AT&T is connected to HD Carrier's network through the tandem switch of a company called Wide Voice in Los Angeles, California.  Millions of calls have been blocked and choked at this tandem connection.  One of the restricted network connections between AT&T and HD Carrier telephone numbers is physically located in Los

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

Angeles, California.  Some of the telephone calls at issue are calls to California telephone numbers.  AT&T sent emails and conducted telephone calls about the issues raised in this complaint with representatives of HD Carrier located in Long Beach, California.  The causes of action arise out of AT&T's conduct in the state of California, among other places.

10.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b)(1) and (2) because AT&T resides in the district and a substantial part of the events or omissions giving rise to the claims occurred in this district.  AT&T is connected to HD Carrier's network through the tandem switch of a company called Wide Voice in Los Angeles, California.  Millions of calls have been blocked and choked at this tandem connection.  One of the restricted network connections between AT&T and HD Carrier telephone numbers is physically located in Los Angeles, California.  Some of the telephone calls at issue are calls to California telephone numbers.  AT&T sent emails and conducted telephone calls about the issues raised in this complaint with representatives of HD Carrier located in Long Beach, California.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

### I.     Telecommunications Background

11.     Among other things, AT&T is a long distance carrier, referred to as an interexchange carrier or "IXC," because it provides connections between local exchanges in different geographic areas.

12.     Under the traditional wireline "public switched telephone network" ("PSTN"), an IXC carries its customers' long distance traffic to the local exchange company ("LEC") that issued the calling number.  The LEC then takes the traffic and delivers it to the called party.

13.     HD Carrier is an IP Enabled Services company ("IPES").  IPES are telecommunications companies that provide phone service based on Voice over Internet Protocol, more commonly known as "VoIP" or "interconnected VoIP technology."  In simple terms, VoIP is a method (now common) for transmitting

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

telephone calls over the internet.  The Commission has adapted the Act to apply to VoIP technology and set forth a plan that anticipates the migration of the entire telecommunications system from the PSTN to VoIP technology.  *See In re Connect America Fund, Report and Order*, 26 FCC Rcd. 17663, at ¶¶ 35, 655, 736 (2011).

14.    On June 23, 2017, HD Carrier filed an application for Interconnected VoIP Numbering Authorization with the Commission, seeking nationwide authority to obtain numbering resources directly from the North American Numbering Plan Administrator.

15.    On April 13, 2018, the Commission's Wireline Competition Bureau granted HD Carrier's application.  In doing so, the Commission authorized HD Carrier to receive telephone numbers.  Since then, HD Carrier has provided these numbers to various services and applications for use in their businesses, which include several well-known conference calling companies, such as Premiere Global Services, Inc. ("PGI"), FreeConferenceCall.com, and Dialpad, Inc.  HD Carrier also provides telephone numbers and services to applications that offer robocall detection and blocking capabilities, such as NoMoRoBo, Teltech, and YouMail, Inc.  These robocall detection and blocking applications were recently touted by the Commission's Chairman Pai for their ability to protect consumers from nuisance and fraudulent calls.

16.    To receive calls transmitted on the public switched telephone network or PSTN, providers of VoIP services, such HD Carrier, typically connect to the PSTN through other regulated phone companies, such as tandem transport and switching providers.  These regulated phone companies, under the provisions of the Act, have obligations and rights to connect to the networks of other traditional wireline phone companies, such as AT&T.

17.    HD Carrier partners with multiple competitive local exchange carriers, or "CLECs" that provide aggregated network interconnection points to the PSTN, known as "tandem connection services."  These include Level 3 Communications

("Level 3"), LLC, Peerless Communications, Inc. ("Peerless"), and Wide Voice, LLC ("Wide Voice"). These companies interconnect with long distance carriers (including AT&T) delivering traffic over the PSTN destined for HD Carrier and ultimately the called party.

18.     Consequently, when an AT&T subscriber calls an HD Carrier telephone number, AT&T may connect the call by delivering it to the tandem designated in the LERG (local exchange routing guide), which is the industry authority for PSTN routing information, for that specific call. In HD Carrier's case, these tandems are owned either by Level 3, Peerless or Wide Voice, who then will route the call to HD Carrier, which, in turn, will "terminate" or connect the call to the application or service. In general terms, the call path is as follows:



19.     The Commission has stated that the termination services that HD Carrier provides to its customers is functionally equivalent to the traditional termination services local exchange carriers provide to their customers.

## II.   Carrier Obligations to Ensure Calls are Completed

20.     The fundamental tenet of United States telecommunications policy is that all calls are to be completed. Over the years, the Commission has consistently restated and reaffirmed this core principle to eliminate dominate market operator behaviors and foster competition.

21.     Congress has required all telecommunications carriers – local and long distance carriers, alike – to interconnect their networks "directly or indirectly with the facilities and equipment of other telecommunications carriers." 47 U.S.C. § 251(a). Interconnection ensures that all consumers can place calls to and receive calls from consumers that are served by a different telecommunications carrier. Without an interconnection requirement, consumers that purchase service from one

carrier would have no assurance of their ability to place calls to consumers served by other carriers.

22.     In 2001, the FCC found that AT&T's refusal to exchange traffic with certain CLECs because AT&T did not want to pay those companies' rates for access was an unlawful blocking of such traffic that "threaten[ed] to compromise the ubiquity and seamlessness of the nation's telecommunications network." The Commission's ruling, found in the 7th Report and Order, stated the following:

> When an IXC's end-user customer attempts to place a call either from or to a local access line, that customer makes a request for communication service – from the originating LEC, the IXC and the terminating LEC. When that customer attempts to call from and/or to an access line served by a CLEC with presumptively reasonable rates, that request for communications service is a reasonable one that the IXC may not refuse without running afoul of section 201(a). This obligation may be enforced through a section 208 complaint before the Commission." "Section 214 of the Communications Act provides, in relevant part, that "[n]o carrier shall discontinue, reduce, or impair service to a community, or part of a community, unless and until there shall first have been obtained from the Commission a certificate that neither the present nor future public convenience and necessity will be adversely affected thereby.

Seventh Report and Order, 16 FCC Rcd 9923, ¶¶ 94-95 (2001).

23.     In 2007, the Commission ordered that "carriers cannot engage in self-help by blocking traffic" and reminded carriers that it "previously found that call blocking is an unjust and unreasonable practice under section 201(b) of the Act." The Commission further stated "Commission precedent provides that no carriers, including interexchange carriers, may block, choke, reduce or restrict traffic in any way." *Call Blocking by Carriers*, WC Docket No. 07-35, Declaratory Ruling and Order, DA 07-2863, at ¶¶ 5-6 (WCB June 28, 2007).

24.     The Commission restated its prohibition on call-blocking in 2011 in its *Connect America Fund Order*. The Commission stated:

> The Commission has a longstanding prohibition on call blocking. In the 2007 Call Blocking Order, the Wireline Competition Bureau emphasized that the ubiquity and reliability of the nation's telecommunications network is of paramount importance to the explicit goals of the Communications Act of 1934, as amended and

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1
2
3

> that Commission precedent provides that no carriers, including interexchange carriers, may block, choke, reduce or restrict traffic in any way. We find no reason to depart from this conclusion. We continue to believe that call blocking has the potential to degrade the reliability of the nation's telecommunications network.

4   In the same order, the Commission declared that "carriers blocking of VoIP calls is

5   a violation of the Communications Act and, therefore, is prohibited just as with the

6   blocking of other traffic." *Connect America Fund*, Report and Order and Further of

7   Notice of Proposed Rulemaking, WC Docket No. 10-90; FCC 11-161, 26 FCC Rcd

8   17663, ¶¶ 734, 973 (Nov. 18, 2011).

9       25.    The following year, 2012, the Commission issued another Declaratory

10   Ruling on call-blocking. In it, the Commission sought to make clear that its

11   prohibition on call-blocking extended to routing practices "that have the effect of

12   blocking, choking, reducing, or otherwise restricting traffic." Specifically, the

13   Commission ruled that a carrier who "knows or should know that calls are not

14   being completed to certain areas, and that engages in acts (or omissions) that allow

15   or effectively allow these conditions to persist, may be liable for a violation of

16   section 201 of the Act." The Commission further stated:

17
18
19
20

> We clarify that it is an unjust and unreasonable practice in violation of section 201 of the Act for a carrier that knows or should know that it is providing degraded service to certain areas to fail to correct the problem . . . . This is particularly the case when the problems are brought to the carrier's attention by customers, rate-of-return carriers serving rural areas, or others, and the carrier nevertheless fails to take corrective action that is within its power.

21   *Establishing Just and Reasonable Rates for Local Exchange Carriers*, Declaratory

22   Ruling, WC Docket No. 07-135, DA 12-154, at ¶¶ 3, 11, 12 (WCB Feb. 6, 2012).

23       26.    AT&T has been the central player in the long history of IXCs

24   employing blocking as coercive measure to stomp out competition and carriers it

25   does not want to do business with. As such, it is fully aware of its obligation to

26   complete calls. In fact, in a recent rulemaking proceeding at the Commission it

27   stated in a letter dated April 9, 2019, that "**Under the Commission's rules, calls to**

28   **access stimulators must be completed, regardless of disputes about**

**compensation.  As a consequence, there is no way for an IXC to avoid completing calls to an access stimulator.**" *See* AT&T Ex Parte Submission, Updating the Intercarrier Compensation Regime to Eliminate Access Arbitrage, WC Docket No. 18-155, Q.4, at p. 24 (emphasis added).

### III.   <u>AT&T'S CALL BLOCKING</u>

27.     Beginning in January 2020 and continuing to the present, AT&T has intentionally, unreasonably, and unlawfully blocked millions of calls made to HD Carrier's telephone numbers.  These calls are being made by AT&T subscribers and subscribers of other phone companies who are trying to reach various conference call services and other services.  AT&T is causing callers to hear busy signals, dropping their calls altogether, or degrading call quality to force them to hang up.

28.     The primary method AT&T has used to choke and block calls is to deliberately reduce and maintain insufficient capacity to HD Carrier's tandem partners throughout the country, including Level 3 and Wide Voice.  AT&T has done this by taking down, or de-provisioning, network connections so to cause its remaining, limited connections to reach capacity and refusing to expand the limited connections it does have.

29.     AT&T also segregates the calls that are incoming to HD Carrier telephone numbers.  AT&T transmits calls to HD Carrier telephone numbers differently than other call traffic by transmitting the calls down trunks and network connections that are capped or severely limited, while non-HD Carrier calls to the very same tandems are transmitted via connections that have sufficient capacity. An AT&T network engineer informed Wide Voice (HD Carrier's tandem partner) that AT&T was capping its connections to Wide Voice when Wide Voice reported outages to AT&T.

30.     On January 25, 2020, AT&T Assistant Vice President Kim Meola wrote to HD Carrier's CEO.  Meola stated that AT&T would remove or stop using all other alternate connections that were formerly in place to connect calls to HD

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

Carrier's customers, unless HD Carrier's customers paid for connection services. This conduct has left the connections between the two networks reduced to a single, undersized thread, without back-up, alternate routes, or the redundancy required of a modern telecommunications network.

31.    It gets worse.  Despite knowing that its lack of capacity is causing call failures, AT&T has been reselling its connections to HD Carrier's tandem partners to other carriers (such as Verizon).  In other words, carriers (like Verizon) are paying AT&T to deliver their calls, ultimately destined to HD Carrier telephone numbers, to HD Carrier's tandem partners, even though AT&T knows that it lacks the capacity to handle its own traffic, let alone the additional traffic from other IXCs.  This has multiplied the number of call failures and exacerbated call quality issues not only for AT&T subscribers, but also other carriers' subscribers as well.

## IV.    THE EXTENT OF AT&T'S CALL BLOCKING

32.    AT&T has admitted that it is blocking calls.  In a letter to the Commission dated March 6, 2020, AT&T informed the Commission that it "currently sees some, but minimal, call blocking at its direct connects."  Millions of blocked calls may be "minimal" to goliath AT&T but are catastrophic to HD Carrier, its customers and the consumers trying to make telephone calls.

33.    The exact number of telephone calls blocked by AT&T is unknown to HD Carrier, but certainly known to AT&T.  At this time, and without discovery, HD Carrier cannot accurately quantify the number of calls that have been made to its telephone numbers but did not reach HD Carrier's network.  The best source of this information is AT&T's call detail records.

34.    Nevertheless, HD Carrier does know that the volume is in the tens of millions based on the evidence it does have of AT&T's call-blocking (in addition to it admitting as much).  This evidence includes daily records of test calls; consumer complaints to applications that rely on HD Carrier's telephone numbers and services; AT&T's own statements to HD Carrier and its network partners; AT&T's

1    statements to the Commission; HD Carrier's network partners' network reports; and

2    internal documentation evidencing major network disruptions.

3        35.    Since January to the present, HD Carrier network operations has

4    conducted 50 test calls (10 test calls to each local routing number) on the hour

5    during peak hours between 7:00 a.m. to 9:00 p.m. eastern nearly every business day

6    from AT&T handsets (phones) to HD Carrier telephone numbers to track AT&T's

7    blocking of calls.  HD Carrier recorded the number of calls that AT&T connected

8    and did not connect.

9        36.    As the test calls demonstrate, for most of January, during normal

10   business hours from 8:00 a.m. to 6:00 p.m., more than 50% of the calls failed,

11   meaning the caller received a busy signal.  The test calls further show that there

12   were many days in January where 80% to 100% of test calls failed, particularly in

13   the morning hours, which are typically busy times of day for HD Carrier's

14   conference calling application customers.

15       37.    As an example, on January 14, 2020, 75% to 90% of calls during that

16   day, depending on the hour, from an AT&T handset to HD Carrier telephone

17   number did not connect.  That is just one example of test calls to one telephone

18   number from a single AT&T handset.

19       38.    Since January, calls have failed at all of HD Carrier's tandem partner

20   locations.  At the end of March, just as the COVID-pandemic began sweeping the

21   nation and Americans *en masse* began to work and learn remotely, 50% to 90% of

22   all AT&T test calls made to a Level 3 tandem in Massachusetts failed.

23       39.    Similarly, on May 27 and 28, nearly 100% of all AT&T calls to HD

24   Carrier's customers transmitted via a Level 3 tandem in Colorado failed for more

25   than 30 hours due to AT&T capping its capacity to connect HD Carrier calls.  HD

26   Carrier network operations was told by AT&T that the AT&T record stated the

27   following: "LRN was in the process of being capped to the new termination and

28   was completed about an hour ago."  LRN means local routing number and is a

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

reference to the HD Carrier Colorado phone numbers.  All AT&T calls to HD Carrier Colorado phone numbers did not connect for over 30 hours because of a failed AT&T connection.

40.     The following graphs have been provided by Wide Voice, who is able to measure and track when AT&T's connections to its tandems reach capacity:



41.     The graphs depict two separate trunk groups AT&T has used (and still uses) to deliver calls to Wide Voice from January 8, 2020 to July 8, 2020.  The red line represents the capacity of the trunk groups.  Capacity is measured by the total number of active concurrent calls the trunk groups can sustain.  The graphs demonstrate that throughout this 7-month period AT&T's connections constantly reached capacity.  This is shown every time a green line touches the red "Max Channels" line.  During the time when capacity is reached, all subsequent calls destined to HD Carrier's customers via Wide Voice fail.  As shown by the graphs, there were periods of time during most days over the last 7 months when calls were failing simply due to AT&T's refusal to provide adequate capacity for calls made to HD Carrier's customers.

42.     A myriad of consumers have complained.  These complaints identify that AT&T subscribers received busy signals, call connection problems, dropped calls, and call quality issues that destroy the ability of the caller to make the call.  Its conference calling application customers have also received thousands of

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

complaints.

43.     AT&T's call blocking has been confirmed by AT&T in a number of instances, including in a communication between an AT&T network engineer and a Wide Voice network engineer on March 19, 2020, in which the AT&T engineer stated that due to capacity constraints, AT&T was rejecting hundreds of thousands of calls destined to HD Carrier's customers per day at a single Wide Voice tandem connection in Miami.

## V.     AT&T'S FAILURE TO ENSURE CALL COMPLETION IS WILLFUL

44.     AT&T was notified nearly one year ago, on July 17, 2019, that HD Carrier would be expanding to new tandem connection partners.  On July 25, 2019, HD Carrier connection partner Wide Voice followed up with AT&T and specifically asked AT&T personnel via email, "if you need anything else . . . Appreciate anything you can get routing in place."  When AT&T received forecasts in November, 2019 of increased call volume to these connections, it refused to take the proper measures to ensure calls would be completed.

45.     In December 2019 and January, 2020, Wide Voice provided AT&T with traffic forecasts showing an increase in traffic that would be routed through its tandems to HD Carrier.  On January 7, 2020, Wide Voice informed AT&T "your trunks in Miami are full.  We have a lot more traffic moving this week to our tandem and ATT will definitely be blocking.  We would like to offer the option of overflowing your traffic to our Tandem in Los Angeles if you are interested."

46.     Wide Voice asked AT&T to provide assurances that the calls would be completed.  In a letter dated January 8, 2020, AT&T declared that calls to HD Carrier routed through Wide Voice tandems were done at Wide Voice's (and HD Carrier's) "own peril."

47.     On January 9, 2020, representatives from AT&T, Wide Voice, HD Carrier and the Commission's Wireline Bureau held a meeting via telephone to discuss the ongoing call blocking.  AT&T continued to refuse to take adequate

measures to connect calls to HD Carrier and its tandem partners.

48.     Through the middle of January 2020, AT&T made minor adjustments to capacity that relieved some of the congestion, but call failures on busy dates still were enormous.  HD Carrier and its tandem partners urged AT&T network engineers to provision many additional DS3 lines (the physical connections between the two networks).  Emails, letters and calls were sent nearly daily offering various solutions to ensure calls were connected.  AT&T ignored this contact and refused to take further measures to ensure sufficient capacity was available to transmit calls down the single threaded connections it insisted on using. Meanwhile, AT&T has left other commercial routes and connections sitting live and idle while thousands upon thousands of callers could not connect their calls.

49.     As calls continued to fail from January through the present, AT&T continued to resell the limited capacity it has connecting to HD Carriers' tandem partners.  Thus, AT&T sold at a profit congested routes that only became significantly more congested with other carriers' traffic over the last six months. AT&T's reselling of these routes has exacerbated call failures for both AT&T and the party to whom it is reselling, resulting in a windfall of profits to AT&T.

50.     AT&T's reselling efforts not only create more congestion, and more failed calls, it is also created quality issues with calls, rendering callers unable to continue with their calls.

51.     HD Carrier, its tandem partner Wide Voice, and one of its application customers, Free Conferencing, have all endeavored to resolve the call blocking issues with AT&T directly since January.  AT&T has even tried to turn the tables, claiming that the call blocking is the result of Wide Voice's action, a specious claim since call blocking is occurring at HD Carrier's other tandem connections, such as Level 3. The blocking is not in dispute.

1
2

## VI.   AT&T IS UNREASONABLY DISCRIMINATING AGAINST HD CARRIER

3   52.   AT&T is treating HD Carrier different than similarly situated IPES

4   companies.  AT&T is providing sufficient capacity and supporting the ability of

5   other tandem providers, CLECs and IPES companies to connect unlimited volumes

6   of traffic to other calling applications without the capping applicable to HD Carrier.

7   53.   For example, AT&T is completing calls to conference calling

8   applications all over the country, such as PGI, WebEx Zoom, Uberconference,

9   FreeConferenceUSA, as well as its own high volume conference calling numbers,

10   in situations where HD Carrier is not acting as the IPES in the call chain.  AT&T is

11   treating similarly situated IPES companies and calling applications differently,

12   providing full call completion services to these telephone numbers.

13   54.   Both PGI and FreeConferenceCall.com have reported that when their

14   numbers are ported and changed to another carrier, AT&T calls to those same

15   numbers are connected without problems.  In fact, FreeConferenceCall.com has

16   stopped using thousands of HD Carrier telephone numbers due to AT&T's call

17   choking and blocking, and instead, now uses services and telephone numbers

18   provided by Peerless, a HD Carrier competitor.  FreeConferenceCall.com reports

19   that once it switched to Peerless its users no longer experienced failed or blocked

20   calls.  AT&T calls to FreeConferenceCall.com are connected without issue via

21   another CLEC, Northern Valley Communications.

22   55.   On March 21, 2020, AT&T took "no position" on Inteliquent's

23   Petition for a Waiver of the Commission's rules on access stimulation citing the

24   exponential growth of calls to conferencing companies as a result of the COVID-19

25   pandemic.  Inteliquent as a CLEC connects millions upon millions of calls to free

26   conferencing services such as Zoom, FreeConferenceUSA and WebEx (AT&T's

27   own conference calling service).

28   56.   AT&T, in stark contrast, rigorously opposed a nearly identical petition

filed by FreeConferenceCall.com, an application that uses HD Carrier telephone numbers. AT&T's position seeks to impose draconian financial penalties on HD Carrier for connecting calls to the same services as other CLECs and IPES entities.

**VII.   HD CARRIER'S DAMAGES**

57.    AT&T is exerting its market power to prevent HD Carrier from being able to deliver calls to its customers.  AT&T's misconduct has had dire consequences on HD Carrier's business.

58.    HD Carrier has lost business from two of the largest conference call services that rely on HD Carrier's telephone numbers, PGI and FreeConferenceCall.com.  In the last few months, these services have ported or moved substantial business away from HD Carrier to its competitors to avoid the connection issues caused by AT&T.

59.    In December 2019, HD Carrier connected approximately 2.4 million minutes of calls per month to PGI.  The volume of these calls increased to nearly 3.8 million minutes of calls in March 2020, when Americans turned to telework *en masse* as the COVID-19 pandemic swept the nation.  However, immediately after this increase and millions of busy signals and failed calls, PGI pulled over one-half of its business from HD Carrier.  HD Carrier now connects only about 1.8 million minutes of calls per month to PGI.  PGI has moved about 2 million monthly minutes of telephone calls, or over 50% of its business, from HD Carrier to its competitors because of AT&T's call choking and blocking.

60.    Over the course of 2020, FreeConferenceCall.com has moved approximately 175,000,000 minutes of calls from HD Carrier to its competitor Peerless as a result of AT&T's call blocking and choking.  This represents a loss for HD Carrier of anywhere from 12-45 million minutes of telephone calls per month.

61.    HD Carrier has lost other business, including Rebtel and International Discount Telecom ("IDT"), due to their users consistently experiencing busy signals, dropped calls and poor call quality.  Rebtel and IDT have moved a

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

combined 30 million minutes of calls per month away from HD Carrier to its competitors.

62.     In total, HD Carrier has lost nearly 40-50% of the volume of calls it was connecting due to AT&T's call choking and blocking.

63.     Additionally, the services that use HD Carrier's telephone numbers, such as PGI, FreeConferenceCall.com, Rebtel and others, have asked HD Carrier to connect additional volumes of calls but HD Carrier has had no choice but to refuse this additional business because AT&T will not complete the calls.  HD Carrier has turned away approximately 250 million minutes of telephone calls a month from these services and applications and lost that business to other competing CLECs such as Northern Valley Communications, Peerless and Inteliquent.  That is business HD Carrier would have had but for AT&T's call choking and blocking to HD Carrier's ingressing connections.

64.     AT&T's actions have damaged HD Carrier's business reputation and the goodwill it has built with its customers.  It has also prevented HD Carrier from being able to find new tandem connection partners.

### First Claim for Relief

### (47 U.S.C. § 201(b), Unjust and Unreasonable Practice)

65.     HD Carrier repeats and re-alleges each and every allegation contained in paragraphs 1 through 64 of this Complaint as if set forth fully herein.

66.     Under 47 U.S.C. § 201(b) of the Act, "[a]ll charges, practices, classifications, and regulations for and in connection with [interstate or foreign] communications service, shall be just and reasonable, and any such charge, practice, classification or regulation that is unjust or unreasonable is declared to be unlawful."

67.     Under the Commission's call blocking precedents, including Call Blocking Declaratory Ruling, 22 FCC Rcd 11629 (2007), "no carrier[], including interexchange carriers, may block, choke, reduce or restrict traffic in any way."

The Commission also prohibits carriers from "degrad[ing]" the performance of the network.

68.     AT&T has engaged in unjust, unreasonable, and unlawful practices in violation of 47 U.S.C. § 201(b) by blocking, choking, and restricting calls to HD Carrier and its customers.

69.     AT&T has engaged in unjust, unreasonable, and unlawful practices in violation of 47 U.S.C. § 201(b) by engaging in routing practices that have the effect of blocking, choking, reducing, or otherwise restricting traffic.

70.     AT&T has engaged in unjust, unreasonable, and unlawful practices in violation of 47 U.S.C. § 201(b) by engaging in self-help by blocking, choking, and restricting calls to HD Carrier and its customers.

71.     AT&T has also engaged in unjust, unreasonable, and unlawful practices in violation of 47 U.S.C. § 201(b) by: (i) failing to prevent foreseeable call congestion after receiving traffic forecasts; (ii) ignoring complaints and trouble tickets reporting millions of failed calls; (iii) failing to take corrective action to address the call congestion and failures; (iv) reselling its limited capacity to connect calls to HD Carrier codes which has further exacerbated call congestion and failures while making a windfall on its unjust and unreasonable conduct; (v) failing to rectify what it knows to be the throttling, choking and blocking of millions of telephone calls since January 2020.

72.     As a direct result of AT&T's violations of 47 U.S.C. § 201(b), HD Carrier has been damaged.

73.     Under 47 U.S.C. §§ 206 and 207, AT&T is liable for the full amount of damages sustained by HD Carrier in consequence of AT&T's violation of 47 U.S.C. § 201(b), together with attorneys' fees.

## **Second Claim for Relief**

### **(47 U.S.C. § 202(a), Unreasonable and Unjust Discrimination)**

74.     HD Carrier repeats and re-alleges each and every allegation contained

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

in paragraphs 1 to 73 of this Complaint as if set forth fully herein.

75.     Under 47 U.S.C. § 202(a), it is:

unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.

76.     AT&T is a common carrier under the Act.

77.     AT&T's actions, as described above, constitute unjust and unreasonable discrimination in violation of 47 U.S.C. § 202(a).

78.     AT&T has engaged in willful, unreasonable, and unjust discrimination in violation of 47 U.S.C. § 202(a) by blocking, choking, and restricting calls to HD Carrier and its customers.

79.     AT&T has engaged in willful, unreasonable, and unjust discrimination in violation of 47 U.S.C. § 202(a) by capping the volume of traffic it is transmitting to HD Carrier.

80.     AT&T has engaged in willful, unreasonable, and unjust discrimination in violation of 47 U.S.C. § 202(a) by engaging in routing practices and providing facilities that cause calls to HD Carrier to be blocked, choked or restricted.

81.     AT&T has also willfully, unreasonably, and unjustly discriminated against HD Carrier in violation of 47 U.S.C. § 202(a) by: (i) failing to prevent foreseeable call congestion after receiving traffic forecasts; (ii) ignoring complaints and trouble tickets reporting millions of failed calls; (iii) failing to take corrective action to address the call congestion and failures; (iv) reselling its limited capacity to connect calls to HD Carrier codes which has further exacerbated call congestion and failures; (v) failing to rectify what it knows to be the throttling, choking and blocking of millions of telephone calls since January 2020.

82.     AT&T is providing like services and facilities to HD Carrier's

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

competitors, such as Peerless, and other similarly situated companies, under different terms and conditions.  AT&T, for example, is connecting all calls to other CLEC/IPES companies that provide telephone numbers to high volume calling applications and so-called "access stimulation" traffic.  AT&T also is not limiting or capping the volume of calls it is transmitting to any other IPES company or CLEC.

83.    AT&T's acts of discrimination are providing HD Carrier's competitors with an unreasonable advantage.

84.    As a direct result of AT&T's violations of 47 U.S.C. § 202(a), HD Carrier has been damaged.

85.    Under 47 U.S.C. §§ 206 and 207, AT&T is liable for the full amount of damages sustained by HD Carrier in consequence of AT&T's violation of 47 U.S.C. § 202(a), together with attorneys' fees.

### Third Claim for Relief

### (28 U.S.C. § 2201(a), Declaratory Ruling)

86.    HD Carrier repeats and re-alleges each and every allegation contained in paragraphs 1 to 85 of this Complaint as if set forth fully herein.

87.    AT&T is blocking and choking calls to HD Carrier's customers and willfully ignoring the complaints, trouble tickets, congested lines, and reports of failed calls.  AT&T claims that it does not need to take steps to properly complete all calls to HD Carrier because they are "access stimulation" calls.

88.    An actual controversy exists between HD Carrier and AT&T regarding AT&T's call blocking.  Pursuant to 28 U.S.C. §§ 2201, HD Carrier seeks a determination of its rights with regard to AT&T's call blocking and unlawful discrimination.  Specifically, HD Carrier seeks a declaration that AT&T is not permitted to block, choke, reduce, restrict or cap the capacity of traffic to HD Carrier.

89.    Pursuant to 28 U.S.C. § 2202, HD Carrier is entitled to further

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

necessary or proper relief based on the Court's declaration of their rights with to AT&T's call blocking.  Among other things, HD Carrier is entitled to an injunction enjoining AT&T from blocking, choking, reducing, restricting or capping the capacity of calls to HD Carrier.

## Fourth Claim for Relief
### (Unfair Methods of Competition, § 17200)

90.     HD Carrier repeats and re-alleges each and every allegation contained in paragraphs 1 to 89 of this Complaint as if set forth fully herein.

91.     AT&T has and continues to engage in unfair competition within the meaning of California Business & Professions Code § 17200 *et seq.*  AT&T has and continues to commit unlawful and unfair business acts and practices in the course of their business activities.

92.     AT&T has and continues to knowingly and willfully block, choke and restrict traffic to HD Carrier.  AT&T has deliberately failed to take corrective action to ensure calls to HD Carrier are completed and not degraded, and has knowingly blocked consumers from reaching HD Carrier telephone numbers.

93.     AT&T's conduct is being done with the intent to cause HD Carrier harm.  AT&T's conduct imposes harm upon the public and consumers, especially those attempting to access services provided by HD Carrier's telephone numbers.  AT&T's conduct therefore significantly threatens and harms competition.

94.     As set forth above, AT&T's business acts and practices also have violated 47 U.S.C. §§ 201(b) and 202(a), and several Commission rulings, and thus is forbidden by law.

95.     As a direct and proximate result of AT&T's unfair and unlawful business acts and practices, HD Carrier is entitled to preliminary and permanent injunctions enjoining AT&T from blocking, choking, reducing, restricting or capping the capacity of calls to HD Carrier.

**PRAYERS FOR RELIEF**

Wherefore, HD Carrier requests that the Court enter judgment against AT&T and provide HD Carrier with the following relief:

(a)    An Order preliminarily and permanently enjoining AT&T from blocking, choking, reducing, restricting or capping the capacity of calls to HD Carrier;

(b)    An Order declaring that AT&T is not permitted to block, choke, reduce, restrict or cap the capacity of calls to HD Carrier; degrade or otherwise restrict the volume or quality of calls to HD Carrier;

(c)    An Order awarding HD Carrier damages, attorneys' fees, interest and other litigation costs for AT&T's violation of 47 U.S.C. § 201(b);

(d)    An Order awarding HD Carrier damages, attorneys' fees, interest and other litigation costs for AT&T's violation of 47 U.S.C. § 202(a);

(e)    An Order awarding HD Carrier damages, attorneys' fees, interest and other litigation costs for AT&T's violation of Cal. Bus. & Prof. Code §§ 17200 *et seq.*; and

(f)    An Order granting HD Carrier such other relief the Court may deem just and proper.

**JURY DEMAND**

HD Carrier demands a trial by jury on all claims so triable.


DATED:  July 22, 2020          **ROBINS KAPLAN LLP**


By:  /s/ Lucas A. Messenger
          Lucas A. Messenger
          Lauren J. Coppola (*pro hac vice* to be filed)
          Timothy D. Wenger (*pro hac vice* to be filed)

Attorneys for Plaintiff HD Carrier, LLC